**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| MAT JESSOP, individually, | ) | |
| and on behalf of others similarly situated, | ) | **Case No:** |
| | ) | |
| Plaintiff, | ) | **CLASS ACTION** |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| PENN NATIONAL GAMING, INC., a | ) | |
| Pennsylvania corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACTA)[1]**

Plaintiff Mat Jessop ("Plaintiff"), on behalf of himself and others similarly situated individuals, sues Defendant Penn National Gaming, Inc. ("Penn National" or "Defendant") and alleges the following upon information and belief, and his own personal knowledge.

**NATURE OF THE CASE**

1.     This action arises from Defendant's violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, as amended (the "FCRA"), which requires Penn National to truncate certain credit card and debit card information on printed receipts provided to consumers. Despite the clear language of

---

[1] Plaintiff would inform the Court that an identical case is currently on file in the Circuit Court of Seminole County, Florida, Case No. 2018-CA-001520. However, in light of the Eleventh Circuit's recent holding in *Muransky v. Godiva Chocolatier, Inc.*, 16-16486, --F.3d--2018 WL 4762434, at *6, 7 (11th Cir. Oct. 3, 2018), Plaintiff wishes to exercise his right to litigate this matter in Federal Court. "The rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction, for both the state and Federal courts have certain concurrent jurisdiction over such controversies, and when they arise between citizens of different states the Federal jurisdiction may be invoked, and the cause carried to judgment, notwithstanding a state court may also have taken jurisdiction of the same case." *McClellan v. Carland*, 217 U.S. 268, 281, 30 S.Ct. 501, 54 L.Ed. 762 (1909).

the statute, Penn National willfully, knowingly, or with reckless disregard, failed to comply with FCRA but printed eight (8) of the credit card or debit card numbers on printed receipts provided to consumers. As a result of Penn National's unlawful conduct, Plaintiff and the Class who have conducted business with Defendant during the time frame relevant to this complaint have suffered a violation of their statutory rights under § 1681c(g), an invasion of their privacy and have been burdened with an elevated risk of identity theft. Recently, the Eleventh Circuit Court of Appeals held that a receipt that failed to truncate the first six and last four digits of a credit or debit card number is a concrete harm. *See Muransky v. Godiva Chocolatier, Inc.*, 16-16486, --F.3d--2018 WL 4762434, at \*6, 7 (11th Cir. Oct. 3, 2018) ("[A] small injury… is enough for standing purposes." … "When a violation of a statute creates a concrete injury, … plaintiffs do not need to allege 'additional harm beyond the one congress identified."). Consequently, Plaintiff and the Class are entitled to an award of statutory damages and other relief as further detailed herein.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction under 15 U.S.C. § 1681p, and 28 U.S.C. §§ 1331 and 1337 because the claims in this action arise under violation of a federal statute.

3.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred here. Defendants do business in this District and their contacts here are sufficient to subject them to personal jurisdiction.

## PARTIES

4.    Plaintiff Mat Jessop is a natural person who resides, and at all times relevant herein has resided, in Seminole County, Florida.

5.     Penn National is a Pennsylvania corporation whose principal address is 825 Berkshire Blvd., Wyomissing, PA 19610, and whose registered agent for service of process is CT Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101.

6.     Penn National owns, operates or has ownership interests in gaming and racing facilities and video gaming terminal operations with a focus on slot machine entertainment. As of June 4, 2018, the Company operated no less than thirty-four facilities in sixteen jurisdictions, including Florida, Illinois, Indiana, Kansas, Maine, Massachusetts, Mississippi, Missouri, Nevada, New Jersey, New Mexico, Ohio, Pennsylvania, Texas, West Virginia, and Ontario, Canada.[2] As of March 31, 2018, in aggregate, Penn National Gaming operated approximately 36,100 gaming machines, 810 table games and 4,800 hotel rooms. The company also offers social online gaming through its Penn Interactive Ventures division.[3]

7.     Penn National conducts business in the state of Florida as the principal owner and operator of Sanford Orlando Kennel Club (the "Sanford Dog Track"), located at 301 Dog Track Road, Longwood, Florida 32750.[4]

8.     At each of its various establishments nationwide, including the Sanford Dog Track, Penn National reaps exorbitant profits from the gambling revenue generated at the expense of its numerous patrons, many of whom are gambling addicts and other vulnerable members of society.

---

[2] Source: http://www.pngaming.com/Locations (Last viewed: October 10, 2018).
[3] Source: http://www.pngaming.com/About (Last viewed: October 10, 2018).
[4] The Sanford Dog Track is a 1/4-mile greyhound facility located in Longwood, Florida. The facility has capacity for 6,500 patrons, with seating for 4,000 and surface parking for 2,500 vehicles. The facility conducts year-round greyhound racing and greyhound, thoroughbred, and harness racing simulcasts. Source: https://pennnationalgaming.gcs-web.com/static-files/64d4a76e-27f7-413a-a9dc-ee11653c2c31 (Last viewed: October 10, 2018).

**FACTUAL ALLEGATIONS**

### A. Background of FACTA

9.      Identity theft is a serious issue affecting both consumers and businesses. In 2015, the FTC received over 490,000 consumer complaints about identity theft, representing a 47 percent increase over the prior year, and the Department of Justice estimates that 17.6 million Americans were victims of identity theft in 2014.[5]

10.      Congress enacted FACTA to prevent actual harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

11.      Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

12.      One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a point of sale transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

13.      Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> **Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.**

15 U.S.C. § 1681c(g) (the "Receipt Provision").

---

[5] *FTC Announces Significant Enhancements to IdentityTheft.gov*, *FTC* (Jan. 28, 2016), https://www.ftc.gov/news-events/press-releases/2016/01/ftc-announces-significant-enhancements-identitytheftgov (Last Accessed: October 10, 2018).

14.     After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

15.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. . . . The first phase of this new policy goes into effect July 1, 2003 for all new terminals. . . . ."[6] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

16.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[7]

17.     Because a handful of large retailers did not comply with their contractual obligations to the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make technical corrections to the definition of willful noncompliance with respect to violations involving the

---

[6] *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003), http://www.prnewswire.com/news-releases/visa-usa-announces-account-truncation-initiative-to-protect-consumers-from-id-theft-74591737.html.
[7]     *Rules     for     Visa     Merchants*,     VISA     (Sept.     1,     2007), http://www.runtogold.com/images/rules_for_visa_merchants.pdf (Last Accessed: October 10, 2018).

printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[8]

18.    Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date of the card number. Instead, it simply provided amnesty for certain past violators up to June 3, 2008.

19.    In the interim, card processing companies continued to alert their merchant clients, including Defendants, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

*See* Visa Alert attached hereto as **Exhibit A**.

20.    As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

---

[8] *H.R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007*, GOV TRACK, https://www.govtrack.us/congress/bills/110/hr4008/text (Last visited: October 10, 2018).

*See* **Exhibit B**, attached hereto.

21.    Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

*See* **Exhibit C**, attached hereto.

22.    According to data from the Federal Trade Commission's 2015 Consumer Sentinel Network Data Book, Florida with its 306,133 complaints ranks No. 1 for the highest per capita rate of reported fraud and other types of complaints. For identity theft, Florida is ranked No. 3 in the country with a total of 44,063 complaints. Also, eight of the top 20 metro areas for identity theft are in Florida, according to the report. First is the Homosassa Springs area with 1290.0 complaints per 100,000 people, and the Miami area counts 482.3 complaints per 100,000 people.[9]

23.    So problematic is the crime of identity theft that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website (http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible identity theft.

---

[9] *Consumer Sentinel Network Data Book for January-December 2015*, Federal Trade Commission (February 2016), https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2015/160229csn-2015databook.pdf.

24.     FACTA clearly prohibits the printing of more than the last five (5) digits of the card number to protect persons from identity theft.

**B. ESTABLISHMENTS SUCH AS PENN NATIONAL ARE BREEDING GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS**

25.     Consumer identity theft, against which the Receipt Provision was designed to protect, is especially rampant at gambling establishments like the one operated by Penn National.

26.     It has been estimated that "40 percent of white-collar crime has its root in gambling."[10]

27.     "[T]he ready availability of credit in and around casinos," including in Penn National's establishment, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises.  Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customers on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[11]

28.     "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[12]  In fact, the correlation

---

[10]The Congressional Record, Feb. 10, 1997, at H401, https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf (citing The Economist, Jan. 25, 1997).

[11] *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, http://govinfo.library.unt.edu/ngisc/reports/7.pdf (Aug. 3, 1999), at 7-14.

[12] *Id.* at 7-13.

between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[13]

29.    "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with white-collar crimes, such as embezzlement, forgery and fraud."[14]  (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' A lot of them do white collar crimes, fraud, credit card and employee theft."[15] (emphasis added).

30.    Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt

---

[13] *Casino Gambling: Is it A Good Bet for Florida's Future?* Jerry J. Yates, at 11, https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx.
[14] *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013), http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf.
[15] *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[16]

31.    More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[17]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[18] In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[19] and ten people were arrested in New Orleans, Louisiana "on racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances

---

[16]*Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinoso pening (Last accessed: October 10, 2018).

[17] *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010),    http://www.ocregister.com/articles/casino-277896-cards-credit.html    (Last    accessed October 10, 2018); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), http://www.independent.com/news/2011/feb/18/deputiesnabfivecreditcardfraud/ (Last accessed: October 10, 2017).

[18] *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.ht ml (Last accessed: October 10, 2018).

[19] Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571- 2f624954b84f.html (Last accessed: October 10, 2018); *10 charged in cash-advance fraud scheme    at    Harrah's    Casino*,    The    Acadiana    Advocate    (July    31,    2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7- 43f7bb8129ea.html (Last Accessed: October 10, 2018).

from Harrah's New Orleans Casino."[20]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[21]

32.    The Federal Trade Commission's Red Flags Rule requires businesses and organizations such as Penn National to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

33.    Penn National is subject to an array of strict federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules uniformly require "creditors," a term encompassing Penn National and its various establishments, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

34.    In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Penn National should certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions.  This would include training cage personnel and other employees to prioritize and keep in confidence

---

[20] *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7 43f7bb8129ea.html (Last accessed: October 10, 2018).

[21] *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHotel365746371.html (Last accessed Mar. 12, 2017).

patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

35.    As part of its ongoing duty to consistently update its identity-theft prevention program, Penn National would reasonably be expected to periodically hire third-party service providers to audit and propose improvements to its compliance program and to train Penn National's cage and other personnel in best practices for identity-theft prevention.  These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply.  Through these and other training programs, Penn National would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

### C.    PENN NATIONAL'S PRIOR KNOWLEDGE OF FACTA

35.    Penn National had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.  There are numerous Florida statutes and operating regulations governing gambling, pari-mutuel wagering, slot machines and card rooms that require Penn National to maintain its establishment in full compliance with state and federal regulations such as FACTA.

36.    Penn National's knowledge and experience regarding federal laws governing financial transactions no doubt translates to Penn National having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

37.    Most of Penn National's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Penn National could have very easily done the same.

38.    Penn National was not only clearly informed not to print more than the last five digits of credit or debit cards, but it was contractually prohibited from doing so. Penn National accepts credit and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card.  Each of these companies sets forth requirements that merchants such as (and including) Penn National, must follow, including FACTA's redaction and truncation requirements found in the Receipt Provision.

39.    As discussed above, the casino gaming industry is one of the main targets for identity theft.  As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Penn National's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its establishment, at minimum Penn National was acting with reckless disregard of the FACTA requirements and purpose when printing eight (8) digits of credit cards and debit cards, together with other pieces of sensitive information of its customers, including their initialed signatures.

40.    Plaintiff is informed and believes, and thereupon alleges, that Penn National knew about the requirement that it truncate credit and debit card numbers on transaction receipts. This

is evidenced by the fact that in the years prior to the illegal conduct alleged herein, Penn National formerly truncated its credit and debit card account numbers in compliance with FACTA.

41.     Plaintiff is informed and believes, and thereupon alleges, that it would take an individual less than one minute to run a test receipt in order to determine whether Penn National's point-of-sale system that printed the FACTA violative receipts was in fact in compliance with federal law(s) or Penn National's own alleged written policy requiring the truncation of credit card and debit card numbers.

42.     Moreover, Plaintiff is informed and believes, and thereupon alleges, that Penn National has had, for over the past year, actual knowledge of other FACTA litigation initiated and threatened to be initiated in courts throughout the country against other gaming establishments that use the same exact debit and credit card processing technology as Penn National uses to process transactions and print receipts.  Remarkably, Penn National's printing of transaction receipts in total violation of FACTA's truncation requirement has continued unabated, in total disregard of the law and its patrons' financial privacy and security.

### D.   PLAINTIFF'S FACTUAL ALLEGATIONS

45.     On or about June 24, 2017, Plaintiff used his personal credit card to perform a transaction at Penn National's Sanford Dog Track in Longwood, Florida.

46.     Plaintiff used his personal credit card and subsequently was presented with an electronically printed receipt bearing the first four (4) and last four (4) digits of his credit card account number.

47.     In addition to bearing eight (8) digits of his credit card number, the receipt also, alarmingly, identifies the complete first and last name of Plaintiff, the individual to whom the card is issued, and the transaction date and time.

### E.    PENN NATIONAL'S MISDEEDS

48.    At all times relevant herein, Penn National was acting by and through its subsidiaries, agents, servants and/or employees, including without limitation the Sanford Dog Track and the employees thereof, as well as the electronic payment processing company retained by Penn National, each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of Penn National.

49.    At all times relevant herein, the conduct of Penn National, as well as that of its subsidiaries, agents, servants and/or employees, including without limitation the Sanford Dog Track and the employees thereof, as well as the electronic payment processing company retained by Penn National, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

50.    Plaintiff is informed and believes, and thereupon alleges, that Penn National implements, oversees, and maintains control over the same uniform debit and credit card payment processing policies, practices, and procedures for the consumer-oriented transactions at issue in this case at all of its establishments nationwide (including without limitation the Sanford Dog Track) – including by, without limitation, negotiating, entering into, and acting pursuant to various contracts and agreements with the electronic payment processing company whose technology Penn National uses to process all such transactions at its establishments nationwide (including without limitation at the Sanford Dog Track).  *See also supra* p. 3 n.1.

51.    The point of sale systems of Penn National, and/or of its agent or agent(s), including without limitation the electronic payment processing company retained by Penn National, maintain records of all payment transactions and store customers' information,

including duplicate hard copies and electronic copies of all payment receipts provided to customers.

52.     Notwithstanding its extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Penn National issued millions upon millions of point of sale receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers.

53.     By shirking the requirements of this important federal statute on such a massive and likely unprecedented scale, in an environment already ripe for identity theft and other evils, *see supra* at pp. 8-13, Penn National uniformly invaded Plaintiff's and the other putative Class members' privacy.    Penn National's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, including identity thieves who thrive in environments such as Penn National's establishment, as well as the Penn National employees who handled the receipts.

54.     Simply put, by printing millions upon millions of transaction receipts in wholesale violation of this duly-enacted, long-standing, and well-known federal statute, Penn National has caused – to paraphrase the words of the Honorable Judge Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Penn National.  *Redman v. RadioShack Corp*., 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

55.     Moreover, Penn National caused Plaintiff and other consumers actual harm not only by invading their privacy and uniformly burdening them with an elevated risk of identity theft, but also by imposing and unjustly retaining substantial service fees from Plaintiff and the

Class members for the privilege of making the debit and credit card transactions at issue in this case in a supposedly secure manner.  Indeed, a substantial portion of the service fees that Penn National charged to Plaintiff and the other members of the Class to facilitate their debit and credit card transactions was supposedly attributable to the various procedural safeguards and compliance monitoring measures that Penn National and its payment processor had implemented to ensure the safe, secure, and legally-compliant processing of consumer transactions.  And in fact, Plaintiff and the other Class members paid these service fees to Penn National with the expectation that their transactions would be processed and their data secured in compliance with all applicable federal laws, including the truncation requirement of FACTA.

56.    In other words, what Plaintiff and the other members of the Class received (insecure transactions recorded on receipts printed and provided to them in violation of federal law) was less valuable than what they paid for (transactions securely processed and recorded on written receipts in compliance with federal data-privacy laws and regulations).  Had Plaintiff and the other members of the Class known that Penn National would process their transactions and safeguard their transaction data insecurely, including by printing and providing to them receipts in violation of FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for the privilege of making the debit and credit card purchases at issue in this case.

57.    In view of the substantial harm and other risks to Plaintiff and the Class caused by Penn National's willfully unlawful conduct, and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Penn National from continuing to print receipts at its point of sale terminals in violation of FACTA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007 (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law).

## CLASS REPRESENTATION ALLEGATIONS

58.    This action is also brought as a Class Action under Fed. R. Civ. P. 23. Plaintiff

proposes the following class, defined as follows, subject to modification by the Court as

required:

> *All persons in the United States who, within the two (2) years*
> *prior to the filing of the complaint through the date of the*
> *Court's order granting class certification, (i) engaged in one or*
> *more transactions using a consumer-issued (viz., not business-*
> *issued) debit card or credit card at one or more of Penn*
> *National's establishments located on non-tribal owned land in*
> *the United States, and (ii) received a printed receipt displaying*
> *more than the last 5 digits of the credit or debit card number used*
> *in connection with such transaction(s).*

59.    Plaintiff falls within the class definition and is a member of the class. Excluded

from the class is Penn National and any entities in which Penn National has a controlling

interest, Penn National's agents and employees, Plaintiff's attorneys and their employees, the

Judge to whom this action is assigned and any member of the Judge's staff and immediate

family, and claims for personal injury, wrongful death, and/or emotional distress.

### A.    CERTIFICATION UNDER EITHER RULE 23(b)(2) OR (b)(3) IS PROPER.

60.    The members of the class are capable of being described without managerial or

administrative problems. The members of the class are readily ascertainable from the

information and records in the possession, custody or control of Penn National.

61.    Penn National prints credit and debit card receipts to many patrons per day, 365

days per year. Therefore, based upon Penn National's annual flow of guests and net income,

*supra*, it is reasonable to conclude that the class is sufficiently numerous such that individual

joinder of all members is impractical. The disposition of the claims in a class action will provide

substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Penn National's records or Penn National's agents' or affiliates' records.

62.     All or most purchases at Penn National's establishment for which a FACTA-violative receipt is provided are paid with a consumer card, rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Penn National and its merchant bank(s) could easily identify whether a particular transaction involved a business card or a consumer card.

63.     Further, the first four (4) digits of a credit or debit card would readily determine whether the corresponding card is a business or consumer card. That is because the first four (4) digits of a credit or debit card number constitute what is known as the Bank Identification Number ("BIN") that represents several items of information, including whether it is a consumer card or commercial (business) card. Finally, Visa, MasterCard, American Express and Discover only allow specific BINs and BIN ranges to identify consumer cards, and specific BINs and BIN ranges identify commercial (business) cards. Consumer cards and business cards do not share the same BINs or BIN ranges.

64.     There are common questions of law and fact that predominate over any questions affecting only the individual members of the class. The wrongs alleged against Penn National are statutory in nature and common to each and every member of the putative class.

65. While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf of the class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

66. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the class predominate over questions that may affect individual Class Members, including the following:

    a. Whether, within the two (2) years prior to the filing of this Complaint, Penn National and/or its agents completed transactions by credit or debit card from any consumer and subsequently gave that consumer a printed receipt upon which more than the last five (5) digits of the card number was displayed;

    b. Whether Penn National's conduct was willful and reckless;

    c. Whether Penn National is liable for damages, and the extent of statutory damages for each such violation; and

    d. Whether Penn National should be enjoined from engaging in such conduct in the future.

67. As a person that patronized one or more of Penn National's establishments and received a printed receipt containing more than the last five (5) digits of his credit card, Plaintiff is asserting claims that are typical of the proposed class. Plaintiff will fairly and adequately represent and protect the interests of the class in that Plaintiff has no interests antagonistic to any member of the class.

68.     The principal question is whether Penn National violated section 1681c(g) of the FCRA by providing Class Members with electronically printed receipts in violation of the Receipt Provision. The secondary question is whether Penn National willfully, knowingly, or recklessly provided such electronically printed receipts, despite knowledge of the unlawful nature of such policy.

69.     Plaintiff and the members of the class have all suffered harm as a result of the Penn National's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Penn National's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Penn National will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

70.     Penn National's defenses are and will be typical of and the same or identical for each of the members of the class and will be based on the same legal and factual theories. There are no unique defenses to any of the Class Members' claims.

71.     A class action is a superior method for the fair and efficient adjudication of this controversy. Classwide damages are essential to induce Penn National to comply with federal law. The interest of Class Members in individually controlling the prosecution of separate claims against Penn National is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

72.    Penn National has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

### COUNT I – VIOLATIONS OF 15 U.S.C. § 1681(c)(g)

73.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

74.    15 U.S.C. §1681c(g) states as follows:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

75.    This section applies to any "device that electronically prints receipts" (hereafter "Devices") at point of sale or transaction. 15 U.S.C. §1681c(g)(3).

76.    Penn National employs the use of said Devices for point of sale transactions at each of its establishments (see footnote #1), including its establishment in Longwood, Florida.

77.    On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Penn National that failed to comply with the Receipt Provision.

78.    At all times relevant to this action, Penn National was aware, or should have been aware, of both the Receipt Provision as well as the need to comply with said provision.

79.    Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, nor the subsequent years since FACTA became effective; and having knowledge of the Receipt Provision and FACTA as a whole; Penn National knowingly, willfully, intentionally, and/or recklessly violated and continues to violate the FCRA and the Receipt Provision.

80.    By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Penn National caused Plaintiff to suffer a heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposed Plaintiff's private information to those of Penn National's employees who handled the receipt and forced Plaintiff to take action prevent further disclosure of the private information displayed on the receipt. *See Muransky*, 2018 WL 4762434, at *6 ("[A] small injury… is enough for standing purposes."…"When a violation of a statute creates a concrete injury,… plaintiffs do not need to allege 'additional harm beyond the one congress identified.").

81.    As a result of Penn National's willful violations of the FCRA, Plaintiff and members of the class continue to be exposed to an elevated risk of identity theft. Penn National is are liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

\*        \*        \*

**WHEREFORE**, Plaintiff Matt Jessop respectfully requests that this Court enter judgment in his favor and the class, and against Penn National Penn National Gaming, Inc. as follows:

a.    Granting certification of the Class;

b.    Awarding statutory damages;

c.    Awarding punitive damages;

d.    Awarding injunctive relief;

e.    Awarding attorneys' fees, litigation expenses and costs of suit; and

f.    Awarding such other and further relief as the Court deems proper under

the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2018.

Respectfully submitted,

*s/ Scott D. Owens*
Scott D. Owens (FBN 597651)
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Ph. 954.589.0588
Fax 954.337.0666
scott@scottdowens.com

Kira M. Rubel (WA SBN 51691)*
LAW OFFICES OF KIRA M. RUBEL
3615 Harborview Drive, Suite C
Gig Harbor, WA 98332-2129
Ph: 800.836.6531
Fax: 206.238.1694
krubel@kmrlawfirm.com

*Pending *pro hac vice* admission