### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### Case No. 6:18-cv-01741-RBD-DCI

| | |
|---|---|
| MAT JESSOP, individually,<br>and on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>PENN NATIONAL GAMING, INC., a<br>Pennsylvania corporation, and EVERI<br>PAYMENTS, INC. a Delaware corporation,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

    **CLASS ACTION**

    **JURY TRIAL DEMANDED**

### THIRD AMENDED COMPLAINT

Plaintiff Mat Jessop, on behalf of himself and others similarly situated individuals, sues Defendants Penn National Gaming, Inc. and Everi Payments, Inc. and alleges the following based on his own personal knowledge, on the investigation of his counsel, and on information and belief as to all other matters, and demands trial by jury:

### INTRODUCTION

1.    This action arises from violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*., as amended (the "FCRA"), which requires the truncation of certain credit card and debit card information on printed receipts provided to consumers.

2.    Despite the clear language of the statute, Plaintiff and putative class members who engaged in credit or debit card transactions while patronizing one or more of Defendant Penn National Gaming, Inc.'s establishments were willfully, knowingly, or with reckless disregard, provided with transaction receipts bearing, among other things, more than the last five digits of the card number.

3.      As a result of the unlawful conduct alleged herein, Plaintiff and the putative class members who conducted business with Defendants during the time frame relevant to this complaint have suffered a violation of their substantive rights under 15 U.S.C. § 1681c(g), an invasion of their privacy, and have been burdened with an elevated risk of identity theft.

4.      Plaintiff and the putative class members paid exorbitant transaction fees to Defendant Everi Holdings, Inc., not only for the convenience of using their credit and debit cards to conduct financial transactions, but also with the reasonable expectation that their sensitive, personal, and private financial information would be safe from unlawful disclosure in an environment rife with individuals ready and willing to use this information to commit any number of financial crimes.

5.      The Eleventh Circuit recently declared that "printing more than five digits of a credit card number in willful violation of FACTA causes the person whose account number is disclosed to suffer a concrete injury." *Muransky v. Godiva Chocolatier, Inc.*, __ F.3d __, 2019 WL 1760292, at *9 (11th Cir. 2019).

6.      Plaintiff and the putative class members, all of whom conducted business with Defendants during the time frame relevant to this complaint and paid for goods using a credit or debit card, have been harmed in one or more ways by Defendants' conduct. As a result, they are entitled to statutory damages and recovery of their transaction fees, which in equity and good conscience should not be retained by Defendant(s).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 15 U.S.C. § 1681p, and 28 U.S.C. §§ 1331 and 1337 because the one of the claims in this action arise under violation of a federal statute.

8.      Under 28 U.S.C. § 1367 this shall have supplemental jurisdiction over all other claims alleged in this action because they are so related to federal claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from one of the Defendants, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

10.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred here. Defendants do business in this District and their contacts here are sufficient to subject them to personal jurisdiction.

## PARTIES

11.     Plaintiff Mat Jessop ("Plaintiff") is a natural person who at all times relevant to this action is and was a resident of Seminole County, Florida.

12.     Defendant Penn National Gaming, Inc. ("Penn National") is a Pennsylvania corporation whose principal address is 825 Berkshire Blvd., Wyomissing, PA 19610, and whose registered agent for service of process is CT Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101.

13.     Penn National owns, operates or has ownership interests in gaming and racing facilities and video gaming terminal operations with a focus on slot machine entertainment. As of October 15, 2018, the company operates 40 facilities in 18 jurisdictions, including Colorado, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Nevada, New Jersey, New Mexico, Ohio, Pennsylvania, Texas, and West Virginia.[1] One such

---

[1] Source: https://www.pngaming.com/about-us (Last viewed: Dec. 12, 2018)

facility is SOKC, LLC, which does business under the fictitious name, Sanford Orlando Kennel Club. Sanford Orlando Kennel Club located at 301 Dog Track Road, Longwood, Florida.

14.    SOKC, LLC is a Delaware limited liability company whose principal address is 825 Berkshire Boulevard, Wyomissing, PA 19610—the same address as Penn National Gaming, Inc.

15.    SOKC, LLC is a member-managed company whose sole member is Penn National. As such, Penn National is wholly responsible for the management and day-to-day operation of Sanford Orlando Kennel Club.[2]  Such responsibilities include, inter alia, maintaining important oversight and control functions over all aspects of the Sanford Orlando Kennel Club's business that implicate matters of consumer privacy, including the safeguarding of cardholders' sensitive financial information, as reflected in the following excerpt of the company's "Code of Business Conduct," last amended March 27, 2015 (which applies to Penn National's responsibilities at all of the approximately 40 establishments it owns and operates, directly or through subsidiaries, across the country, including the Sanford Orlando Kennel Club):

> **E. Handling Confidential Information and Public Communication**
> Employees should observe the confidentiality of information that they acquire by virtue of their positions at the Company, including information concerning development plans, merger and acquisition opportunities, guests, marketing strategy, technical information, suppliers, pricing information, employees' social security numbers, employees' bank account information, employees' medical information, and other confidential information that provides a competitive advantage to the Company, except where the Company expressly approves in writing disclosure or the

---

[2] Source: *Domain Associates, LLC v Shah*, No. 12921-VCL n.153 (Del. Ch. Aug. 13, 2018) (*See* 6 Del. C. § 18-402 (establishing the default rule that management of an LLC is "vested in its members in proportion to the then current . . . interest of members in the profits of the limited liability company owned by all of the members," with the decision of "members owning more than 50 percent of the said percentage or other interest in the profits controlling")).

disclosure is otherwise legally mandated. Special sensitivity is accorded to financial information, which should be considered confidential except where the Company approves disclosure, or the disclosure is otherwise legally mandated. . . .

**F. Employees Who Handle or Have Access to Financial Information**

In addition to any other applicable laws dealing with financial information, financial reporting, internal accounting controls, auditing matters or public disclosure, the Company requires that any employees involved in financial reporting, internal accounting controls, auditing or public disclosure or with access to such information follow the highest ethical standards, including the following guidelines:

• Act with honesty and integrity and avoid violations of the Code, including actual or apparent conflicts of interest with the Company in personal and professional relationships.

• Disclose to the Chief Compliance Officer any material transaction or relationship that reasonably could be expected to give rise to any violations of the Code, including actual or apparent conflicts of interest with the Company.

• Provide the Company's other employees, consultants, and advisors with information that is accurate, complete, objective, relevant, timely, and understandable.

• Endeavor to ensure full, fair, timely, accurate, and understandable disclosure in the Company's periodic reports and in other public communications.

• Act in good faith, responsibly, and with due care, competence and diligence, without misrepresenting material facts.

• Respect the confidentiality of information acquired in the course of Company work. Confidential information acquired in the course of Company work must not be used for personal advantage.

• Proactively promote ethical behavior among peers in your work environment.

• Exercise responsible use of and control over all assets and resources employed or entrusted to you.

• Record or participate in the recording of entries (such as expenses, billing information, and hours worked) in the Company's books and records information that is accurate to the best of your knowledge.

• Not fraudulently induce, coerce, manipulate, or mislead any internal or external auditor or accountant.

• Report to the Chief Compliance Officer any dishonest, unethical, or misleading conduct that could impact the accuracy of the Company's financial reporting.

Penn National Gaming Inc., "Code of Business Conduct," Mar. 27, 2015, at 5-6 (a copy of which is attached hereto as Exhibit D).

16.     Defendant Everi Payments, Inc. ("Everi") is a Delaware corporation whose principal address is 7250 South Tenaya Way, Suite 100, Las Vegas, NV 89113 and whose registered agent for service of process is Registered Agent Solutions, Inc. 4625 W. Nevso Drive, Suite 2, Las Vegas, NV 89103.Everi is a registered money transmitter in the State of Florida, license number FT230000010.

17.     Everi provides, among other things, products and services related to gaming establishments. It offers Casino Cash Plus 3-in-1 ATMs, which are cash-dispensing machines that enable automated teller machine (ATM) cash withdrawals, point of sale (POS) debit card cash access transactions, and credit card cash access transactions.[3].

18.     At all times relevant to this action, Everi has been the exclusive provider of ATM and cash-access services to gamblers at all of Penn National's approximately 40 gaming establishments nationwide, including the SOKC establishment at all times relevant to this action.[4]

---

[3] Source: https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=21826788 (Last viewed: Dec. 12, 2018).
[4]     *See* "Everi and Penn National Extend Cash Access Services Agreement," press release jointly issued by Penn National and Everi dated November 5, 2018 (Everi and Penn National

19.     Penn National maintains important oversight (including with respect to matters of data privacy and the handling of its patrons' financial data) over the services provided by Everi to the patrons of all of Penn National's establishments, among them the SOKC establishment, and Penn National has the absolute right to control Everi's ability to continue providing credit and debit card cash-access services to patrons of its SOKC establishment, including by, if it so chooses, terminating Everi as a vendor and ceasing to permit Everi to conduct cash-access transactions with its patrons at the SOKC facility.

20.     Everi, under the control of Penn National, provides cash-access services to patrons who frequent all of the Penn National-owned- and/or operated establishments across the country (including the SOKC establishment), pursuant to a single, uniform contract entered into between Everi and Penn National.  In providing these services at the SOKC facility, Everi accepts credit cards and debit cards for the transaction of business – i.e., the sale of its cash-access services to patrons of the SOKC establishment -- in the state of Florida, as Penn National's agent.

21.     Penn National has acknowledged Everi's role as its agent by knowingly providing debit and credit card cash-access services to the patrons of its SOKC establishment (and all of its other establishments nationwide) that are performed with Everi's technology and Everi's payment terminals and other equipment (which bear Everi's (or its predecessor GCA's) logo), are processed

---

stating, in joint press release, that "Penn National owns, operates, or has ownership interest in gaming and racing facilities . . . [and] now operates 40 facilities in 18 jurisdiction," that "Everi has been a long time provider of ATM, cash advance, and check warranty services for Penn National," "provid[ing] a full range go cash advance services for Penn National" that are utilized at those establishments, one of which is the SOKC, and announcing a "four year extension of [Everi's] cash advance, ATM, check warranty, and redemption device servicesagreement with Penn National Gaming, Inc. . . . [at all of its] 40 properties in 18 jurisdictions throughout the United States."), *available at* https://seekingalpha.com/pr/17322843-everi-pennnational-gaming-extend-cash-access-services-agreement (last accessed May 15, 2019).

through Everi's bank, and which ultimately result in the printing and providing to these customers of transaction receipts that bear Everi's logo and telephone number.

22.     Everi provides cash-access transaction services to Penn National's patrons, including in Florida by providing such services to patrons of Penn National's SOKC facility. In so doing, Everi accepts debit and credit and debit cards from individuals who wish to purchase the cash-access services it provides at Penn National's establishments on Penn National's behalf, including the SOKC facility in Florida, at all times under the ultimate oversight and control of Penn National.  In connection with such transactions, including those that customers purchase from Everi in Florida at the SOKC facility on Penn National's behalf, Everi prints and provides receipts to customers, with the employees of the SOKC facility acting in turn as Everi's agents, with the entire operation overseen and controlled by Penn National.

23.     Thus, at all times relevant to this action, Everi has acted as agent of its long-time client Penn National with respect to the processing of cash access transactions at all of the approximately forty (40) Penn National gaming establishments nationwide that Penn National has contracted with Everi to provide its services at, one of which includes the SOKC, and the employees of the SOKC's facility have in turn acted as Everi's agent in completing such transactions, including in  printing and providing receipts in connection therewith to patrons of the SOKC establishment.

## FACTUAL ALLEGATIONS

### A.     <u>Background of FACTA</u>

24.     In 2003, FACTA was enacted by Congress, and signed into law by President George W. Bush. One of FACTA's primary purposes was to amend the FCRA through the addition of identity theft protections for consumers.

25.     One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a point of sale transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

26.     Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> **"Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction."**

(the "Receipt Provision").

27.     After enactment, FACTA provided three years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

28.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained:

> "Today, I am proud to announce an additional measure to combat identity theft and protect consumers.  Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts.  The card's expiration date will be eliminated from receipts altogether. . .. The first phase of this new policy goes into effect July 1, 2003 for all new terminals. . .." [5]

Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

---

[5]   Source:   http://www.prnewswire.com/news-releases/visa-usa-announces-account-truncation-initiative-to-protect-consumers-from-id-theft-74591737.html (Last accessed: Dec. 12, 2018).

29.     These processing companies have required that credit card expiration dates not be shown since 2003 and still require it.  For example, according to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

*See*, Exhibit A.

30.     American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

*See* Exhibit B.

31.     Similarly, MasterCard requires in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "* ," or "#," that are neither blank spaces nor numeric characters.

*See* Exhibit C.

32.      In *Muransky, supra*, the Eleventh Circuit concluded that unlawful disclosure of one's credit card information on a transaction receipt was akin to several common law torts,

including breach of confidence and breach of an implied bailment, both of which satisfy *Spokeo's* rule that acts bearing a "close relationship" to conduct actionable at common law can satisfy Article III.

33.     In addition, the burden of having to take the trouble to keep and safely dispose of the receipt, to prevent further disclosure of the information on it, is an "additional harm" incurred as a result of the breach of one's duty to mask a customer's information.

## B.     Gambling Establishments are Breeding Grounds for Identity Thieves and Other White-Collar Criminals

34.     Consumer identity theft, against which the FACTA Receipt Provision was designed to protect, is especially rampant at gambling establishments like the ones operated by Penn National.

35.     It has been estimated that "40 percent of white-collar crime has its root in gambling."[6]

36.     "[T]he ready availability of credit in and around casinos," including in Penn National's establishments, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises.  Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customers on their credit cards as cash advances. Casinos, through the use of equipment such as that provided by Everi, charge fees for cash advances ranging from 3 percent to 10 percent or more."[7]

---

[6]The     Congressional     Record,     Feb.     10,     1997,     at     H401, https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf     (citing     The Economist, Jan. 25, 1997).

[7] *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact     Study     Commission,     Government     Publishing     Office, http://govinfo.library.unt.edu/ngisc/reports/7.pdf (Aug. 3, 1999), at 7-14.

37.    "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[8]   In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[9]

38.    "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with <u>white-collar crimes, such as embezzlement, forgery and fraud</u>."[10]  (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft</u>."[11]  (emphasis added).

39.    Casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have been

---

[8] *Id.* at 7-13.

[9] *Casino Gambling: Is it A Good Bet for Florida's Future?* Jerry J. Yates, at 11, https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx.

[10] *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013), http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf.  (Last Accessed: Dec. 12, 2018).

[11] *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[12]

40.   In November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[13]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[14]  In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[15] and ten people were arrested in New Orleans, Louisiana "on racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received

---

[12]*Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinosopening (Last viewed: Oct. 10, 2018).

[13] *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (Last accessed October 10, 2018); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), https://www.independent.com/news/2011/feb/18/deputies-nab-five-credit-card-fraud/     (Last viewed Dec. 12, 2018).

[14] *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.html (Last viewed: Oct. 10, 2018).

[15] Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (Last viewed: Oct. 10, 2018); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (Last viewed: Oct. 10, 2018).

tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[16]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[17]

41.     The Federal Trade Commission's Red Flags Rule requires businesses and organizations such as Penn National to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

## C.   Defendants' Obligations under the Federal Trade Commission's Red Flags Rule

42.     Penn National and Everi are subject to an array of strict federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules uniformly require "creditors," a term encompassing Penn National and its various establishments, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

43.     In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Penn National and Everi should certainly have considered and addressed,

---

[16] *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7 43f7bb8129ea.html (Last viewed: Oct. 10, 2018).

[17] *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHote l365746371.html (Last viewed: Oct. 16, 2018).

among other things, the need for strict compliance with FACTA's receipt truncation provisions.  This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

44.     As part of its ongoing duty to consistently update its identity-theft prevention program, Penn National and Everi would reasonably be expected to periodically hire third-party service providers to audit and propose improvements to its compliance program and to train Penn National's cage and other personnel in best practices for identity-theft prevention.  These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply.  Through these and other training programs, Penn National and Everi would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

### D.  **Defendants' Prior Knowledge of FACTA**

45.     Defendants have actual knowledge of FACTA's truncation requirement and violate the law nonetheless.  There are numerous statutes and operating regulations governing gambling, pari-mutuel wagering, slot machines and card rooms that require Penn National to maintain its establishment in full compliance with state and federal regulations such as FACTA.

46.     Moreover, as a purveyor of cash-dispensing machines that enable automated teller machine (ATM) cash withdrawals, point of sale (POS) debit card cash access transactions, and credit card cash access transactions, Everi should be especially sensitive to the truncation requirements imposed by FACTA.

47.     Defendants' knowledge and experience regarding federal laws governing financial transactions no doubt translates to both Penn National and Everi having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

48.     Most of Defendants' business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendants could have very easily done the same.

49.     Defendants are not only statutorily required to refrain from printing more than the last five digits of credit or debit cards, but they are contractually prohibited from doing so; each of the major credit card companies sets forth requirements that businesses such as Penn National and Everi must follow, including FACTA's redaction and truncation requirements.

50.     Together, Everi and Penn National provide electronically printed receipts to customers subsequent to transactions involving credit or debit cards at Penn National's establishments and numerous others throughout the country (in the case of Everi). Everi provides the means for the printing of such receipts. Together, they are joined in an enterprise that systematically violates individuals' statutory rights, exposes them to unacceptable risks of identity theft and other injuries, not the least of which is the charging of exorbitant transaction fees without regard for rights of the individuals who entrust Defendants with their sensitive, personal, and private financial information.

51.     Plaintiff is informed and believes, and thereupon alleges, that Defendants implement, oversee, and maintain control over the same uniform debit and credit card payment processing policies, practices, and procedures for the consumer-oriented transactions at issue in this case at all the establishments nationwide at which each of the Defendants provides such services to customers.

52.     The systems of Defendants, and/or of their agent or agent(s), maintain records of all payment transactions and store customers' information, including duplicate hard copies and electronic copies of all payment receipts provided to customers.

53.     Notwithstanding the fact that it has extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendants issued thousands, perhaps millions, of transaction receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers.

54.     By shirking the requirements of this important federal statute on such a large scale, in an environment already ripe for identity theft and other evils, *see supra* at pp. 7-11, Defendants uniformly invaded Plaintiff's and the other putative Class members' privacy, breached their confidence, mishandled their personal account information, and exposed them to an elevated risk of identity theft.  Defendants' conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, such as identity thieves who thrive in environments such as Defendants' establishment, and those of the Defendants' employees who handled the receipts.

55.     Simply put, by printing numerous transaction receipts in violation of this long-standing, and well-known federal statute, Defendants have caused – to paraphrase the words of the Honorable Judge Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or

so obvious that it should [have been] known" to Defendant.  *Redman v. RadioShack Corp.*, 768

F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

56.     Moreover, Defendants also harmed Plaintiff and other consumers by imposing and

unjustly retaining substantial service fees from Plaintiff and the Class members for the privilege

of making the debit and credit card transactions at issue in this case in a supposedly secure manner.

Indeed, a substantial portion of the service fees that Defendants charged to Plaintiff and the other

members of the Class to facilitate their debit and credit card transactions was supposedly

attributable to the various procedural safeguards and compliance monitoring measures that Penn

National and its payment Everi had implemented to ensure the safe, secure, and legally-compliant

processing of consumer transactions. And in fact, Plaintiff and the other Class members paid these

service fees to Defendants with the expectation that their transactions would be processed and their

data secured in compliance with all applicable federal laws, including the truncation requirement

of FACTA.

57.     In other words, what Plaintiff and the other members of the Class received (insecure

transactions recorded on receipts printed and provided to them in violation of federal law) was less

valuable than what they paid for (transactions securely processed and recorded on written receipts

in compliance with federal data-privacy laws and regulations).  Had Plaintiff and the other

members of the Class known that Defendants would process their transactions and safeguard their

transaction data insecurely, including by printing and providing to them receipts in violation of

FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for

the privilege of making the debit and credit card purchases at issue in this case.

58.     In view of the substantial harm and other risks to Plaintiff and the Class caused by

Defendants' willfully unlawful conduct, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)

(defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law), and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendants from continuing to print receipts at its casino terminals in violation of FACTA.

**E.  Factual Allegations Specific to Plaintiff**

59.     On or about June 24, 2017, Plaintiff used his personal credit card to perform a transaction at the Sanford Orlando Kennel Club.

60.     Upon completion of the transaction, Plaintiff was presented by Defendants with an electronically printed receipt bearing the first four and last four digits of his credit card account number; significantly more than allowed under FACTA.

61.     Plaintiff was charged a substantial fee for the transaction, which culminated with him being provided the violative receipt.

62.     Defendants, one or both of them, knowingly retained the fee, and in return failed to provide Plaintiff with the full benefit of the bargain—i.e., failing to complete the transaction without placing Plaintiff's sensitive, personal, and private financial information at risk.

63.     Upon information and belief, the machine and system that printed the receipt was designed, programmed, maintained and operated by Everi.

**F.  Penn National's and Everi's Misdeeds**

64.     At all times relevant herein, both Penn National and Everi were acting directly or by and through their subsidiaries, agents, servants and/or employees, including without limitation those at Penn National and/or the Sanford Orlando Kennel Club; each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of Penn National and/or Everi.

65.     Despite their prior knowledge of the requirements of FACTA and the dangers imposed upon consumers through failure to comply, Defendants caused the issuance of millions of transaction receipts containing the first and last four digits of credit and debit card numbers.

66.     By ignoring the requirements of FACTA on a perhaps unprecedented scale—in an environment already ripe for identity theft and other evils—Defendants uniformly violated Plaintiff's and the other putative class members' substantive statutory rights, invaded their privacy, placed sensitive, personal financial data at risk of theft, and took money without providing full benefit of the purpose for which it was paid.

67.     By providing millions of transaction receipts in wholesale violation of FACTA, Penn National and Everi have caused – to paraphrase the words of the Honorable Judge Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known." *Redman v. RadioShack Corp*., 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

## CLASS ALLEGATIONS

68.     Upon information and belief, Penn National utilizes the Everi machines and systems describes herein at all forty establishments and provides the same FACTA-violative receipts to patrons who engage in credit or debit card transactions at those facilities.

69.     Upon additional information and belief, patrons who engage in credit or debit card transactions at other Penn National facilities are uniformly charged transaction fees in the matter described herein; both Defendants profit therefrom.

70.     Patrons who engage in credit or debit card transactions at other gambling facilities across the country serviced by Everi services are uniformly charged transaction fees in the matter described herein for the transactions at issue in this case-fees which Everi collects and profits from.

71.     Accordingly, this action brought as a Class Action under Fed. R. Civ. P. 23. Plaintiff proposes the following classes, defined as follows, subject to modification by the Court as required:

> ### The FACTA Class
> **All persons in the United States who, within the two (2) years prior to the filing of the complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a consumer-issued (viz., not business-issued) debit card or credit card at one or more of Penn National's establishments located on non-tribal owned land in the United States, and (ii) received a printed receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

> ### The Unjust Enrichment Class
> **All persons in the United States who, within the four (4) years prior to the filing of the complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a consumer-issued (viz., not business-issued) debit card or credit card at an establishment located on non-tribal owned land in the United States, (ii) which provides electronically printed receipts using Everi machines and systems; (iii) who were charged a transaction fee collected at least in part by Everi; and (iv) received a printed receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

72.     Plaintiff falls within both class definitions and is a member of both classes. Excluded from the class are Defendants' and any entities in which Penn National and Everi have a controlling interest, Defendants' agents and employees, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

A.      **Certification Under Either Rule 23(b)(2) or (b)(3) is proper**.

73.     As a licensed money transmitter, Everi is required by law to maintain certain records, some or all of which may be used identify those individuals who made the transactions at issue in this complaint.

74.     Therefore, the members of each class are capable of being described without managerial or administrative problems. Their identities are readily ascertainable from the information and records in the possession, custody or control of Defendants.

75.     Defendants print and provide credit and debit card receipts to many patrons per day, 365 days per year. Therefore, based upon Penn National's annual flow of patrons, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendants' records or Defendants' agents' or affiliates' records.

76.     All or most transactions at Defendants' establishment for which a FACTA-violative receipt was provided were made using a consumer credit or debit card, rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendants' and their merchant bank(s) could easily identify whether a particular transaction involved a business card or a consumer card.

77.     There are common questions of law and fact that predominate over any questions affecting only the individual members of the class. The wrongs alleged against Defendants' are statutory in nature and common to each and every member of the putative class.

78.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the class predominate over questions that may affect individual Class Members, including the following:

a.  Whether, within the two years prior to the filing of this action, patrons of one or more of Penn National's establishments were presented with receipts printed by Everi and/or Penn National upon which more than the last five digits of the card number was displayed;

b.  Whether, within the four years prior to the filing of this action, patrons who were provided with such receipts were charged a transaction fee;

c.  Whether Defendants' conduct was willful, knowing, or reckless;

d.  Whether Defendants, one or both of them, are liable for damages, and if so, to what extent;

e.  Whether any or all of the transaction fees at issue were unjustly retained by Defendants, one or both of them, and if so whether and how much of those funds should be disgorged;

f.  Whether Defendants should be enjoined from engaging in such conduct in the future.

79.     As a person that patronized one or more of Penn National's establishments and received a printed receipt containing more than the last five (5) digits of his credit card, Plaintiff is asserting claims that are typical of the proposed class. Plaintiff will fairly and adequately

represent and protect the interests of the class in that Plaintiff has no interests antagonistic to any member of the class.

80.     The principal questions are whether Penn National violated section 1681c(g) of the FCRA by providing class members with electronically printed receipts in violation of the Receipt Provision and whether Everi should be forced to disgorge or provide restitution in the amount of some or all of the transaction fees it collected. The secondary question is whether Defendants willfully, knowingly, or recklessly facilitated the production and provision of such electronically printed receipts, despite knowledge of the unlawful nature of such policy.

81.     Plaintiff and the members of the class have all suffered harm as a result of the Defendants' unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Penn National's and other Everi-serviced establishments, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendants will continue such illegal conduct. Because of the size of the individual class members' claims, few class members would find it cost-effective to seek legal redress for the wrongs complained of herein.

82.     Defendants' defenses are and will be typical of and the same or identical for each of the members of the class and will be based on the same legal and factual theories. There are no unique defenses to any of the class members' claims.

83.     A class action is a superior method for the fair and efficient adjudication of this controversy. Classwide damages are essential to induce Penn National and Everi to comply with federal law. The interest of class members in individually controlling the prosecution of separate claims against Defendants' are small. The maximum statutory damages in an individual action for

a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

84.     Defendants' have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## COUNT I
## PENN NATIONAL'S VIOLATION OF 15 U.S.C. § 1681(c)(g)

85.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

86.     15 U.S.C. §1681c(g) states as follows:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

87.     This section applies to any "device that electronically prints receipts" (hereafter "Devices") at point of sale or transaction. 15 U.S.C. §1681c(g)(3).

88.     Penn National employs the use of said Devices for point of sale transactions at each of its establishments including the Sanford Orlando Kennel Club.

89.     On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Penn National that failed to comply with the Receipt Provision.

90.     At all times relevant to this action, Penn National was aware, or should have been aware, of both the Receipt Provision as well as the need to comply with said provision.

91.     By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Penn National caused Plaintiff and the putative class members to suffer a heightened risk of identity theft, especially as the receipt displays the full name of the card

holder on the it together with other sensitive information including the card holder's initialed signature; exposed Plaintiff's private information to those of Defendants' employees who handled the receipt and forced Plaintiff to take action prevent further disclosure of the private information displayed on the receipt. *See Muransky*, 2018 WL 4762434, at *6 ("[A] small injury… is enough for standing purposes."…"When a violation of a statute creates a concrete injury,… plaintiffs do not need to allege 'additional harm beyond the one congress identified.").

92.     As a result of Penn National's willful, knowing, or reckless violations of the FCRA, Plaintiff and members of the class continue to be exposed to an elevated risk of identity theft. Penn National is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

## COUNT II
## UNJUST ENRICHMENT AGAINST EVERI
## (RESTITUTION FOR MONEY HAD AND RECEIVED)

93.     Plaintiff incorporates the paragraphs 1-2, 4-6, 8-11, 13, and 16-79 as if fully set forth herein.

94.     Plaintiff and members of the Unjust Enrichment Class conferred a monetary benefit on Defendant Everi.

95.     Defendant Everi received and retained money belonging to Plaintiff and the Unjust Enrichment Class in the form of transaction fees charged to their credit or debit cards.

96.     Defendants, one or both of them, appreciate or have knowledge of such benefit.

97.     The transaction fees that Plaintiff and the Unjust Enrichment Class paid to Defendant Everi are used to pay for the administrative costs of data management and security, and Plaintiff and the Unjust Enrichment Class paid the fees with the expectation that their transactions would be paid in a secure and legally-compliant manner.

98.     However, Plaintiff's and the Unjust Enrichment Class's Everi-facilitated transactions were neither secure nor legally compliant, as alleged above.

99.     Under principles of equity and good conscience, Everi should not be permitted to retain the money belonging to Plaintiff and the Class, because Everi failed to implement data management and security measures that are mandated by federal law.

100.    Accordingly, Defendant Everi has received money from Plaintiff and the Unjust Enrichment Class through the unlawful practices alleged herein, which in equity and good conscience should be returned.

*       *       *

**WHEREFORE**, Plaintiff Mat Jessop respectfully requests that this Court enter judgment in his favor and on that of the Unjust Enrichment class, and against Defendant Everi Payments, Inc. as follows:

a.  Certifying this case as a class action on behalf of the Class defined above, and appointing Plaintiff as representative of the Class, and appointing his counsel as Class Counsel;

b.  Awarding statutory damages for Defendant Penn National's violations of FACTA;

c.  Declaring that Defendant Everi, through its actions, was unjustly enriched;

d.  Awarding restitution to Plaintiff and the Class against Defendant Everi in an amount to be determined at trial;

e.  Awarding injunctive relief against both Defendants;

f.  Awarding attorneys' fees, litigation expenses and costs of suit against both Defendants; and

g.  Awarding such other and further relief as the Court deems proper under the

circumstances against both Defendants.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 17, 2019                    Respectfully submitted,

/s/ Frank S. Hedin
Frank S. Hedin

FRANK S. HEDIN
**HEDIN HALL LLP**
1395 Brickell Ave, Suite 900
Miami, Florida 33131
fhedin@hedinhall.com
Tel: (305) 357-2107
Fax: (305) 200-8801

Scott D. Owens (FBN 597651)
**SCOTT D. OWENS, P.A.**
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Ph. 954.589.0588
Fax 954.337.0666
scott@scottdowens.com

Kira M. Rubel (WA SBN 51691)
**LAW OFFICES OF KIRA M. RUBEL**
3615 Harborview Drive, Suite C
Gig Harbor, WA 98332-2129
Ph: 800.836.6531
Fax: 206.238.1694
krubel@kmrlawfirm.com
admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this date via U.S. mail and/or some other authorized manner for those counsel or parties, if any, who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Frank S. Hedin
Frank S. Hedin